```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION


AMANDA DYAN MORRIS,                 )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      No. 4:10 CV 2427 DDN
                                    )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
            Defendant.              )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Amanda Dyan Morris for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 423 <u>et seq.</u> and for supplemental security income under Title XVI of that Act, 42 U.S.C. §§ 1382 <u>et seq.</u>  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 7.)

For the reasons set forth below, the court reverses the decision of the Administrative Law Judge (ALJ).

**I.   BACKGROUND**

On December 7, 2007, plaintiff applied for disability insurance benefits and supplemental security income alleging an onset date of December 31, 2004 due to osteoarthrosis and allied disorders, and affective mood disorders.  (Tr. 44.)  Her claim was denied initially and she requested a hearing before an ALJ.[1]  (Tr. 53, 58.)

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case.  20 C.F.R. §§ 404.906, 404.966 (2007).  These modifications include, among other things, the elimination of the reconsideration step. <u>See id.</u>

On December 16, 2009, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 6-17.) On November 1, 2010, the Appeals Council denied her request for review. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

On February 15, 2004, plaintiff was seen at the St. Alexius emergency room complaining of upper back pain and neck stiffness following a motor vehicle accident that occurred the previous day. An x-ray revealed no fractures or dislocations of the cervical vertebrae and that the intervertebral spaces were of average width. (Tr. 233-34.)

On December 4, 2004, plaintiff was evaluated for a medial meniscal tear and chronic knee pain. A magnetic resonance imaging (MRI) scan revealed lateral displacement of the right kneecap and thinning of the lateral femoral condylar articular cartilage. There was no evidence of a meniscal tear. (Tr. 227-28.)

On March 16, 2005, plaintiff saw David Glick, M.D. at Family Care Health Centers regarding abdominal pain, acid reflux, and depression. On May 19, 2005, Dr. Glick noted that plaintiff had chronic osteoarthritis and surgical failure in the right knee, which substantially limited her activity. Dr. Glick also noted that plaintiff was on Lexapro for depression and, although she felt better when she took it, she forgot to do so every other day. (Tr. 273-75.)

On November 17, 2005, plaintiff was seen at the emergency room at St. Alexius for acute abdominal pain. She was diagnosed with kidney stones and sent home with medication. Four days later, Dr. Glick diagnosed plaintiff with pyelonephritis (a kidney infection) and ureterolithiasis (kidney stones) and he ordered plaintiff to be admitted at St. Mary's Hospital. (Tr. 270.) Plaintiff underwent a ureteroscopy the following day, which revealed the stone had passed and there was distal left urethral narrowing and mild stenosis. (Tr. 297-98.) Plaintiff was discharged the next day with a diagnosis of her kidney stones being resolved. (Tr. 299-300.)

On January 4, 2006, Dr. Glick treated plaintiff for a headache. Dr. Glick opined that it was a new-onset primary migraine with contribution

from an over-the-counter analgesic rebound.  (Tr. 267.)  On January 8, 2006, plaintiff was seen at the emergency room for a headache.  (Tr. 249.)  A computed tomography (CT) scan was generally unremarkable.  (Tr. 252.)

On August 1, 2006, Dr. Glick stated that plaintiff's bilateral knee pain was worsening.  He noted there was knee ligament repair and substantial crepitance, or cracking sound, in the right knee and planned to obtain x-rays of both knees and an orthopedic consult.  (Tr. 266.)  X-rays taken on August 7, 2006 revealed no fractures, dislocations, destructive processes, or soft tissue abnormalities in either of plaintiff's knees.  (Tr. 287-88.)

On September 11, 2006, plaintiff saw John M. Lesher, M.D. at Washington University School of Medicine's Department of Orthopaedic Surgery for longstanding right knee pain.  Plaintiff stated that she previously had arthroscopic knee surgery but that it did not relieve her symptoms.  She took Ibuprofen as needed to treat the pain.  She explained that it is difficult to walk up and down stairs and she had to take the stairs one step at a time, bringing both feet to a step before taking an additional step.  Plaintiff denied lower back pain or any pain radiating from the lower back into either leg.  Dr. Lesher noted that plaintiff was morbidly obese and did not do any type of home exercise or weight loss program.  Dr. Lesher also noted that plaintiff did "not have a strong opinion on whether she wants to work or not."  (Tr. 284-86.)

Dr. Lesher's physical examination revealed slight effusion, or swelling, in the right knee, instability in both knees, genu valgum positioning of bilateral knees,[2] and slight discomfort over medial joint line palpation. Dr. Lesher noted that plaintiff had full lower extremity strength in all major muscle groups, but had difficulty performing single leg standing squats on her left leg and refused to do the squats on her right leg.  X-rays revealed no obvious abnormalities.  Dr. Lesher opined that plaintiff's right knee pain along the medial joint line may be related to a patellofemoral process or a meniscal injury.  (Tr. 285.)

---

[2]"Genu valgum," or "knock-knee" is a deformity in which there is lateral angulation of a leg in relation to a thigh.  Stedman's Medical Dictionary 800 (28th ed. 2006).

On March 12, 2007, Dr. Glick treated plaintiff for nasal congestion, recurrent depression, and severe dysmenorrhea (menstrual pain). He ordered plaintiff to stop over-using over-the-counter Ibuprofen, authorized a trial of Anaprox, and re-started plaintiff on Lexapro for the depression. (Tr. 265.)

From May 2007 through January 2008, plaintiff was treated by Jacob Lamb, D.P.M. at Tesson Ferry Foot and Ankle. (Tr. 323-31.) Plaintiff met with Dr. Lamb on May 8, 2007, when she reported pain in her left heel. Dr. Lamb noted that plaintiff had significant arthritis in both knees and a history of stomach ulcers. Dr. Lamb also noted that plaintiff had pain to palpation at the insertion of the plantar fascia on the left foot, had difficulty reaching zero degrees with her knee extended, and had pain with dorsiflexion of the ankle. Dr. Lamb diagnosed plaintiff with plantar fasciitis of the left heel and administered a cortisone injection. Dr. Lamb also recommended plaintiff take up to 800 mg of Ibuprofen three times a day and wear arch supports. (Tr. 330-31.)

On May 22, 2007, plaintiff told Dr. Lamb that her left heel pain was ten to twenty percent better than at her last visit and that the injection had helped "for a couple days." Dr. Lamb noted that plaintiff was compliant with stretching but was not wearing supportive shoes and was taking over-the-counter Ibuprofen. He also noted plaintiff continued to have pain to palpation at the insertion of the plantar fascia on the left foot, but had no significant pain to palpation throughout the midsubstance of the fascia. Dr. Lamb administered another cortisone injection. He also instructed plaintiff to discontinue taking Ibuprofen and prescribed Piroxicam. (Tr. 326.)

On June 7, 2007, Dr. Lamb saw plaintiff for a follow-up visit. Plaintiff said that her pain was "100% relieved." Dr. Lamb noted that plaintiff had no pain to palpation at the insertion of the plantar fascia of the left foot, no pain with lateral compression of the calcaneus, and no pain throughout the midsubstance of the fascia. Dr. Lamb assessed plaintiff with resolving plantar fasciitis of the left heel and instructed her to discontinue the prescription for Piroxicam. (Tr. 328.)

On September 13, 2007, Dr. Lamb saw plaintiff for recurrent left heel pain and the recent onset of right heel pain. Dr. Lamb noted that plaintiff had "almost out of proportion pain to palpation" over the insertion of the plantar fascia on the bilateral feet. X-rays of the right foot revealed evidence of inferior calcaneal spurring, but no evidence of fractures, stress fractures, or dislocations. Dr. Lamb diagnosed plaintiff with recurrent plantar fasciitis of the left foot and plantar fasciitis and heel spur syndrome in the right foot and administered a cortisone injection. He also prescribed Piroxicam and recommended plaintiff purchase over-the-counter arch supports. (Tr. 327.)

At a follow-up visit on September 27, 2007, Dr. Lamb noted that plaintiff stated that the last cortisone injection helped but that the pain had returned. Dr. Lamb also noted that plaintiff had been compliant with stretching, had quit taking Piroxicam because it gave her nausea, and did not yet have arch supports because she could not afford them. Dr. Lamb also noted that plaintiff continued to have pain to palpation over the insertion of the plantar fascia bilaterally. Dr. Lamb diagnosed plaintiff with plantar fasciitis and heel spur syndrome and administered another cortisone injection. He again recommended plaintiff purchase orthotics. (Tr. 326.)

Dr. Glick saw plaintiff again on October 10, 2007 for severe chronic bilateral knee pain. He noted that plaintiff had been seen by an orthopaedist in the past for patellofemoral pain syndrome and had surgery. He also noted that plaintiff complained of frequent heart palpitations, episodes of "bright red face," and more frequent headaches. Dr. Glick's physical exam revealed that plaintiff had tender anterior knee structures and patellar crepitance. Dr. Glick diagnosed patellofemoral pain syndrome and prescribed an increase in Ibuprofen. (Tr. 262-63.)

On January 3, 2008, plaintiff completed a Work Activity Report - Employee form in which she described her work history since 2004, including her work at Michael's Stores and Prime Time Child Care. (Tr. 158-63.) A Social Security interviewer recommended an onset date of

December 31, 2004, and found that after that date, plaintiff's work was either not substantial gainful activity or unsuccessful. (Tr. 165.)

On January 11, 2008, plaintiff completed a Work History Report in which she described her prior work at Burger King, Grandpa Pigeon's, Taco Bell, Adecco, and Michael's. (Tr. 184-91.) That day, plaintiff also completed a Missouri Supplemental Questionnaire in which she stated that knee problems and depression kept her from working. (Tr. 203.) Plaintiff indicated that she could do laundry, make the bed or change sheets, vacuum or sweep, and go to the post office, but that she could not do the dishes, iron, take out the trash, or do other home repairs. (Tr. 206.)

On January 11, 2008, Amanda L. Asbridge, plaintiff's friend, filled out a Function Report Adult - Third Party form. (Tr. 192-200.) Asbridge stated that plaintiff is limited by pain and cannot stand or walk for long periods of time, but can lift small items, climb stairs slowly, occasionally prepare meals, do some household chores, drive, go shopping, take her children to school, and go to church. Asbridge also noted plaintiff needs help remembering to take her medication and that plaintiff had used a brace, cane, wheel chair, or walker when she goes out. (Id.)

On January 31, 2008, Dr. Glick saw plaintiff for a dental abscess that was causing ear pain. (Tr. 355.) On February 13, 2008, Dr. Glick saw plaintiff for a cough, sore throat, and laryngitis. (Tr. 354.) On April 3, 2008, Dr. Glick saw plaintiff for abdominal pain and a probable peptic ulcer. Dr. Glick noted that plaintiff takes daily Ibuprofen for severe daily bilateral knee pain. (Tr. 353.)

On February 11, 2008, Robert Cottone, Ph.D., a non-examining state agency psychologist, completed a Psychiatric Review Technique form regarding plaintiff. Dr. Cottone opined that plaintiff's mental impairment was not severe. (Tr. 337). Dr. Cottone also opined that plaintiff's impairment did not limit her daily living activities or ability to maintain social functioning, and only mildly limited her ability to maintain concentration, persistence, or pace. (Tr. 345.)

In June, 2008, Dr. Glick saw plaintiff and noted that although she had seen a gastrointestinal (GI) specialist for an initial visit,

plaintiff cancelled a scheduled endoscopy.  Plaintiff's chief complaint was severe disabling knee and ankle pain.  Dr. Glick noted that plaintiff had previous surgeries and believed she had "tarsal tunnel."  Although Tylenol was not helping plaintiff's symptoms, Dr. Glick was hesitant to try a cortisone injection; he prescribed Darvocet.  (Tr. 352.)

On July 7, 2008, an ultrasound revealed that plaintiff had gallstones.  Upper GI films showed that plaintiff had a duodenal ulcer and mucosal thickening consistent with duodenitis.  Plaintiff could not consistently remember to take Protonix or Citalopram.  Dr. Glick also stated that he would arrange hospitalization for a cholecystectomy (removal of the gall bladder).  (Tr. 349.)

Plaintiff was subsequently admitted to St. Mary's Health Center from July 14 to July 17, 2008 due to subacute abdominal pain, cholelithiasis (gall stones), and a peptic ulcer.  A laparoscopic cholecystectomy was performed, during which the cholangiogram was abnormal.  An upper endoscopy and endoscopic retrograde cholangiopancreatography (ERCP) were also performed.  (Tr. 373, 377.)  Plaintiff experienced no problems with the ERCP procedure.  (Tr. 365.)

On July 22, 2008, plaintiff reported to Dr. Glick that she was having trouble sleeping and her pain medication was not totally effective.  Dr. Glick then prescribed Ambien and a trial of Ultram for these issues.  (Tr. 363.)

On July 25, 2008, plaintiff saw Thomas J. Vitale, M.D. for a postoperative exam.  A pathology report indicated cholecystitis (gall bladder inflamation) with cholelithiasis (gall stones).  Dr. Vitale noted that since being discharged, plaintiff was having regular bowel movements, her abdomen was soft and nontender, her wounds were clean, dry, closed, and healing well, and she was resuming her usual activity.  (Tr. 365.)

On October 1, 2008, Dr. Glick noted that plaintiff's abdominal pain had subsided but that she still experienced chronic bilateral knee pain which was "partially relieved" with medication.  Dr. Glick observed subpatellar crepitance and a full range of motion, and diagnosed plaintiff with chronic anterior knee pain and chondromalacia, or softening of the cartilage under the kneecap.  (Tr. 360.)

On April 1, 2009, Dr. Glick noted that plaintiff had chronic bilateral knee pain, tarsal tunnel in her right foot, fasciitis in her left foot, major depressive disorder, and dysmenorrhea. Dr. Glick prescribed Naproxen and Darvocet for the pain, restarted Citalopram for depression, and advised plaintiff to follow-up with an OB/GYN for the dysmenorrhea. (Tr. 387.)

On June 22, 2009, Dr. Glick noted plaintiff had acute pain and swelling in the right foot, which was "moderate" on exam. A Doppler study[3] revealed no evidence of deep vein thrombosis. (Tr. 414-15.)

On June 25, 2009, plaintiff was seen by Dr. Lamb for pain and swelling in the left foot. Dr. Lamb diagnosed plaintiff with a possible stress fracture of the second metatarsal of the right foot and tenosynovitis of the right ankle, although x-rays revealed no evidence of any fractures, stress fractures, or dislocations. Dr. Lamb applied a metatarsal pad to reduce pressure near the possible stress fracture and administered a cortisone injection to treat plaintiff's tenosynovitis. (Tr. 418.)

On July 2, 2009, Alan Morris, M.D. conducted a consultative orthopedic examination of plaintiff. (Tr. 388-99). The only outside medical information he was given prior to the examination was a note from Family Care Health Center, dated April 2009, which indicated that plaintiff had chronic bilateral knee pain, tarsal tunnel in the right foot, and plantar fasciitis in the left foot. (Tr. 388.) Dr. Morris noted that plaintiff previously had surgery on her right knee, which plaintiff felt made her symptoms worse. Plaintiff also stated that her knee pain began eight to ten years ago, with the right being worse than the left. Plaintiff also stated that she experienced stiffness in both knees after sitting for fifteen minutes and that she requires help to straighten them out. Plaintiff reported that she could walk thirty minutes with pain, sit for twenty minutes, and stand for twenty minutes. Plaintiff also reported that she could walk up stairs slowly, but could only go down stairs one step at a time and that going down stairs was

---

[3]A Doppler Test uses reflected sound waves to see how blood flows through a blood vessel. WebMD, http://www.webmd.com/a-to-z-guides/doppler-ultrasound (last visited September 19, 2011).

more painful. (Tr. 388-89.) Plaintiff stated that she can lift twenty pounds, does not use a cane or braces, can dress and care for her personal hygiene, and can do activities around the house so long as they did not require squatting, kneeling, or bending. (Tr. 389.)

A physical examination conducted by Dr. Morris, also on July 2, 2009, revealed that plaintiff weighed 280 pounds. Dr. Morris noted that plaintiff could walk fifty feet in the office without a cane but did have a slight limp favoring the right leg. Plaintiff was able to walk on her toes but was not asked to walk on her heels due to her history of plantar fasciitis. Plaintiff was able to squat to twenty degrees of knee flexion and stood with ten degrees valgus[4] of the right knee compared with the left. Regarding range of motion, Dr. Morris stated that plaintiff had full extension of zero degrees and 130 degrees flexion for both knees. Dr. Morris reported plaintiff did not have joint effusion or soft tissue thickening of either knee but had tenderness along the medial and lateral retinacula[5] of the right patella and hypermobility of the right patella with positive apprehension and slight lateral subluxation, or dislocation. Additionally, ligament testing indicated a negative Lachman's test, negative Drawer's test,[6] and no varus[7] or valgus laxity. Plaintiff's relative strength, hamstrings, and quadriceps were 4/5 bilaterally. (Tr. 389-90.)

Dr. Morris opined that plaintiff had bilateral knee arthralgia, or joint pain, right greater than left, and that her history suggested

---

[4] "Valgus" describes any extremity joint in which the more distal of the two bones deviates away from the midline. Stedman's Medical Dictionary 2085.

[5] "Lateral retinacula" refers to the fibrous tissue on the outside of the knee joint. Stedman's Medical Dictionary 1682.

[6] Drawer's test and Lachman's test are used to test the integrity of the anterior crucial ligament. Sports Medicine Institute, http://www.sportsdoc.umn.edu/Clinical_Folder/Knee_Folder/Knee_Exam/lachmans.htm, and http://www.sportsdoc.umn.edu/Clinical Folder/Knee_Folder/Knee_ Exam/anteriord¨rawer.htm (last visited May 19, 2010).

[7] "Varus" describes any extremity joint in which the more distal of the two bones deviates toward the midline. Stedman's Medical Dictionary 2091.

patellofemoral instability, but this was unconfirmed because Dr. Morris lacked prior medical records. (Tr. 390.)

Dr. Morris also completed a Medical Source Statement of Ability to Do Work-Related Activities, in which he opined that plaintiff could lift and carry up to ten pounds frequently and up to twenty pounds occasionally; could sit for twenty minutes, stand for twenty minutes, and walk for thirty minutes at one time without interruption; could sit for five hours, stand for two hours, and walk for one hour in an eight-hour work day; and could use her hands and feet frequently. (Tr. 393-95.) Regarding postural activities, Dr. Morris opined that plaintiff could climb stairs and ramps and balance occasionally, but could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (Tr. 396.) Dr. Morris also opined that plaintiff could never be exposed to unprotected heights, could only occasionally be exposed to moving mechanical parts, humidity and wetness, extreme heat or cold, and could only occasionally operate a motor vehicle. (Tr. 397.)

On July 2, 2009, plaintiff saw L. Lynn Mades, Ph.D., for a psychological evaluation. (Tr. 400-09.) The mental status examination revealed plaintiff was alert, spontaneous, coherent, relevant, and logical. (Tr. 402.) Dr. Mades diagnosed depressive disorder not otherwise specified (NOS) with a Global Assessment of Functioning (GAF) score of 75.[8] (Tr. 404.) Plaintiff's Wechsler Memory Scale - Third Edition (WMS-III) scores were in the average range, but her working memory scored significantly higher than both immediate memory and general memory. (Tr. 403-04.) In an accompanying Medical Source Statement of

---

[8]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 71-80 indicates that symptoms, if any, are transient and expectable reactions to psycho-social stressors (such as difficulty concentrating after a family argument) and no more than a slight impairment in social, occupational, or school functioning (such as temporarily falling behind in schoolwork). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

Ability to Do Work-Related Activities, Dr. Mades stated that plaintiff had a mild mood impairment that may affect her ability to interact appropriately with others but that she could respond appropriately to usual work situations and changes in the work setting.  (Tr. 407-08.)

On September 17, 2009, plaintiff saw Dr. Glick for complaints of episodic hand numbness and tingling, palpitations, and up-and-down pedal edema.  Dr. Glick noted that plaintiff was anxious and crying and that she frequently forgot to take her Citalopram.  Dr. Glick ordered a lab test, recommended a change in diet, and gave plaintiff a pill box to help her remember to take her medication.  On October 21, 2009, Dr. Glick noted that plaintiff's edema had improved but that she still could not remember to take her Citalopram despite being "clearly aware that it benefits her."  (Tr. 412-13.)

In an undated and unsigned Disability Report - Adult form, plaintiff stated that she had arthritis and constant pain in her knees and plantar fasciitis.  Plaintiff reported that she was taking Citalopram for depression, Ibuprofen for knee pain, and Prilosec for acid reflux.  She described her job history, including work as a cashier, child care provider, product flow coordinator, retail clerk, short order cook, telemarketer, and warehouse worker.  She also reported that she had attended one year of college and has special job training as a medical assistant.  (Tr. 170-79.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on November 4, 2009.  (Tr. 26-42.)  Plaintiff testified to the following.  She is 5 feet 2 inches tall and weighs 285 pounds.  She completed one year of college and received a certificate for vocational training in medical assisting.  She previously worked as a product flow coordinator at Michael's, where she unloaded trucks and checked in and put out freight, which required her to lift between five and fifty pounds.  She also worked at Prime Time Academy, a daycare center, but stated she had to quit working due to headaches.  Prior to that, she worked in the warehouse at Adecco, where she folded clothes and took clothes out of boxes and put them on hangers.  (Tr. 29-33.)

Plaintiff testified that she cannot work because of pain in her knees, feet, neck and back. The pain in her knees is "pretty much constant" but the pain in her right knee is worse than the left. The pain in her feet comes and goes "[s]ometimes a couple times a day, sometimes every other day." She has not been treated for her back pain and her neck pain occurs "not very often." (Tr. 34-35.)

Plaintiff testified that she can sit for about half an hour before having to get up or move around, otherwise she has stiffness. She can stand for approximately twenty minutes. She can walk around a block without any pain. She can go up and down steps, but must go one step at a time and use a handrail. She can lift approximately one gallon of milk but could not lift and carry it as much as two-and-a-half to three hours in an eight-hour day because it "would be too heavy and too much weight on [her] knees." She has trouble bending and crouching. She uses a cane "[w]hen the pain is really bad and [her] knees give out." She sits with her knees in a reclining position at night and has swelling from her knees down. (Tr. 35-37.) Sometimes her knees "get stuck" and she needs assistance to move them. (Tr. 40-41.) She sometimes forgets to take her medications. (Tr. 37.)

Plaintiff testified that each day, she takes her children to school, picks up around the house, uses the computer, reads, and watches television. (Tr. 37.) She does some cooking and some laundry but does not do dishes, sweep, mop, vacuum, or do yard work. She also does the grocery shopping, shops, and goes to church. (Id.) She does not need assistance with taking care of personal needs, such as bathing or dressing. (Tr. 38-39.)

Plaintiff testified that she has several symptoms of depression, including feeling down and irritable, having crying spells, problems sleeping, and problems concentrating. (Tr. 40.) She also testified that she plans to arrange treatment from a mental health provider. (Tr. 39.)

### III.   DECISION OF THE ALJ

On December 16, 2009, the ALJ issued a decision denying plaintiff's claims. (Tr. 6-17.) At Step One of the required sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful

activity since December 31, 2004, the alleged onset date. (Tr. 11.)  At Step Two, the ALJ found that plaintiff has severe impairments of bilateral degenerative joint disease of the knees, bilateral plantar fasciitis and heel spurs, and obesity.  The ALJ found that her impairments of abdominal pain, diagnosed as chondromalacia,[9] and depression, were not severe. (Tr. 11-13.) At Step Three, the ALJ found that plaintiff does not suffer from an impairment or combination of impairments of a severity that meets or medically equals a listed impairment found in 20 C.F.R. Part 404, Subpart P, App'x 1.  (Tr. 13.)

The ALJ then determined that plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she cannot lift or carry more than ten pounds occasionally and less weight frequently; stand or walk more than two hours in an eight-hour workday; climb ramps and stairs, balance, or stoop more than occasionally; or climb ladders, ropes or scaffolds or crouch, kneel, or crawl ever. (Tr. 13-14.)

At Step Four, the ALJ found that plaintiff is unable to perform any past relevant work.  At Step Five, the ALJ found, after applying the Medical-Vocational Guidelines, that given plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could perform, i.e. unskilled sedentary work.  Accordingly, the ALJ concluded the plaintiff was not disabled. (Tr. 16-17.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

---

[9]The record cited by the ALJ indicates that the examining physician attributed plaintiff's abdominal pain to possible duodenitis, involving the gastrointestinal tract, not to chondromalacia. (Tr. 357.)

Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her impairment meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant has the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant has the RFC to perform other work. Id.

In this case, the ALJ determined that plaintiff cannot perform any of her past relevant work, but has the RFC to perform other work existing in significant numbers in the national economy.

## V.   DISCUSSION

Plaintiff argues the ALJ's decision is not supported by substantial evidence. First, plaintiff alleges that the ALJ erred in using the Medical-Vocational Guidelines (the "Grids") instead of calling a vocational expert (VE) when she suffers from the nonexertional impairment of pain. Second, plaintiff alleges that the ALJ erred in failing to consider Dr. Morris' opinion that plaintiff can never stoop.

**A.   Use of the Medical-Vocational Guidelines or "Grids"**

Plaintiff argues the ALJ erred in applying the Grids because she suffers from the nonexertional impairment of pain. The Commissioner contends that use of the Grids was proper because pain is a symptom, not an impairment, and even if pain is a nonexertional impairment, plaintiff's pain was insignificant.

Nonexertional limitations are those limitations affecting a claimant's ability to meet the demands of a job other than strength demands, that is, "demands other than walking, lifting, carrying, pushing, or pulling." Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2000). See also SSR 96-9p, 1996 WL 374185, at *5 (July 2, 1996) ("[A] nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling.") (emphasis omitted). Pain is also considered a nonexertional impairment as it can affect an individual's concentration, posture, reaching, lifting, and ability to sit or stand for a length of time. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998) ("Pain is a nonexertional impairment.").

Typically, when the claimant has a nonexertional impairment, such as pain, the ALJ is not permitted to rely exclusively on the Grids to determine disability; the ALJ must obtain testimony from a VE. Haley v. Massanari, 258 F.3d 742, 747-48 (8th Cir. 2001).

Here, the ALJ discredited plaintiff's allegation that pain prevented her from engaging in all sustained work activity. The ALJ then relied solely on the Grids rather than calling a VE. In addressing the credibility of a claimant's subjective allegation of pain, the ALJ is

required to consider a number of factors, including the claimant's prior work; daily activities; duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  To reject a claimant's complaints of pain, the ALJ is required to make an express credibility determination, detail the reasons for discrediting the claimant, set forth any inconsistencies, and discuss the Polaski factors. Beckley, 152 F.3d at 1060.  Here, the inconsistencies the ALJ relied upon to discredit plaintiff's allegation of pain are not supported by substantial evidence.

The ALJ did not expressly address the duration, frequency, and intensity of plaintiff's pain.  The record is unequivocal, however, that plaintiff suffers from pain.  (Tr. 227-28, 262-63, 266, 272-73, 284-88, 325-31, 352, 360-61, 387-90, 414-15, 418.)  Plaintiff testified before the ALJ that she cannot work because of the pain in her knees, feet, and neck.  In particular, she testified that the pain in her knees is "pretty much constant."  (Tr. 34-35.)  The objective medical evidence supports plaintiff's allegations of pain.  An MRI taken in December 2004 showed evidence of degenerative changes in plaintiff's right knee.  (Tr. 227-28.)  The medical record shows Dr. Glick treated plaintiff for bilateral knee pain regularly after the MRI.  Additionally, Dr. Lamb diagnosed plaintiff with plantar faciitis and heel spur syndrome.  (Tr. 326.) These diagnoses are consistent with plaintiff's allegations of pain.

Further, although the ALJ stated that no lay witness testimony provided significant independent evidence to support plaintiff's claims, plaintiff's friend, Amanda Asbridge, filled out a Function Report Adult - Third Party form stating that plaintiff suffers from pain that limits her daily activities in a number of ways.  (Tr. 192-200.)  Asbridge's statement is also consistent with plaintiff's allegations of pain.

Regarding the dosage, effectiveness and side effects of plaintiff's medication, the ALJ found that plaintiff required only minimal or conservative treatment, there is no evidence the medication is not generally effective when taken as prescribed, and there is no evidence plaintiff requires prescribed orthotic or assistive devices. See Cline v. Sullivan, 939 F.2d 560, 568 (8th Cir. 1991) (stating that a claimant's

- 16 -

subjective allegation of pain can be discredited by evidence that plaintiff received only minimal treatment or takes pain medications only occasionally). The record, however, shows that plaintiff regularly sought medical treatment for knee pain since 2004 and for foot pain since 2007. During that time, she was prescribed both over-the-counter and prescription pain relievers. For plaintiff's knee pain, Dr. Glick first prescribed Ibuprofen but later prescribed stronger medications of Naproxen and Darvocet. Even with treatment, plaintiff testified that her knee pain continued to be "pretty much constant." (Tr. 34-35.) For her foot pain, Dr. Lamb administered cortisone injections and prescribed Piroxicam, which plaintiff stopped taking because it gave her nausea. Additionally, Dr. Lamb recommended plaintiff use arch supports and orthotics to treat her foot pain, although plaintiff told Dr. Lamb she was unable to do so because she could not afford the devices. (Tr. 326, 330-31.) This treatment is consistent with plaintiff's allegations of pain.

Both Polaski factors discussed here indicate that plaintiff suffers from pain that cannot be completely discounted. Although her pain may not be severe enough to be disabling, plaintiff was entitled to have a VE testify regarding how it impacts the jobs she can perform. Therefore, the ALJ erred in discounting plaintiff's subjective complaints of pain and erred in relying solely upon the Grids when determining whether plaintiff has the RFC to perform a full range of unskilled sedentary work.

**B.  Opinion of Dr. Morris**

Plaintiff also argues that the ALJ erred in affording no weight to Dr. Morris's opinion that plaintiff has a complete inability to stoop. The ALJ stated that he gave no weight to this opinion because there was no allegation or objective evidence that plaintiff was unable to stoop and because plaintiff's daily activities required her to stoop.

Social Security hearings are non-adversarial proceedings and it is the ALJ's duty to fully develop the record. Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010). An ALJ has a duty to re-contact a physician (whether treating or consulting) if the physician's opinion on a critical

issue is inadequate, unclear, incomplete, or based on unacceptable clinical or laboratory techniques. Id. at 320; Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (citing 20 C.F.R. §§ 104.1512(e), 416.912(e)).

Here, the question of whether plaintiff could either never stoop or only occasionally stoop is a critical issue. If plaintiff is able to stoop occasionally, from very little to up to one-third of the time, the nonexertional limitation will not necessarily preclude a finding that she is not disabled. SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996) (stating that the ability to stoop only occasionally "only minimally erode[s] the unskilled occupational base of sedentary work"); SSR 83-14, 1983 WL 31254, at *2 (1983) (stating that "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person . . . would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job)"). If plaintiff is completely unable to stoop, however, the ALJ is required to consider that she does not have the RFC for unskilled sedentary work and therefore, is disabled. SSR 96-9p, 1996 WL 374185, at *8 ("A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply.") (emphasis omitted).

The ALJ discounted Dr. Morris's opinion that plaintiff can never stoop, reasoning that the opinion was not supported by objective evidence. Dr. Morris conducted an orthopedic consultative examination of plaintiff and provided a report describing his examination and impressions. (Tr. 388-90.) Dr. Morris also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form wherein he checked a box indicating that plaintiff could never stoop. (Tr. 393-98.) It is unclear why Dr. Morris reached this opinion because he failed to provide a basis for his conclusion in either his report or on the form. Dr. Morris's report suggests, however, that this conclusion could have been based on objective medical evidence. For example, Dr. Morris explained that plaintiff was able to walk on her toes normally during this examination but that he did not ask her to walk on her heels because of her history with plantar fasciitis. (Tr. 389.)

- 18 -

Because Dr. Morris's report is unclear as to whether his opinion rests on objective medical evidence, the ALJ should have re-contacted Dr. Morris to determine what basis, if any, Dr. Morris had for his opinion regarding plaintiff's inability to stoop.  See <u>Higgins v. Apfel</u>, 136 F.Supp.2d 971, 978 (E.D. Mo. 2001) ("If the physician's reports of the claimant's limitations are stated only generally, the ALJ should ask the physician to clarify and explain.").

Therefore, the ALJ erred in giving no weight to that part of Dr. Morris's opinion regarding plaintiff's inability to stoop without first re-contacting Dr. Morris to obtain clarification.  On remand, the ALJ should re-contact Dr. Morris to obtain clarification regarding plaintiff's ability to stoop.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed under Sentence Four of 42 U.S.C. § 405(g) and remanded for reconsideration and further proceedings consistent with this opinion.  An appropriate Judgment Order is issued herewith.

      /S/   David D. Noce   
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 16, 2011.